FILED

2020 Jul-22  AM 11:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

JOHNNIE FOX,                          )
                                      )
      Plaintiff,                    )
                                      )
v.                                    )          Case No.  5:19-cv-00919-AKK-JHE
                                      )
SGT. JASPER LAWINSKY, et al.,         )
                                      )
      Defendants.                   )

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Johnnie Fox filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the Constitution or laws of the United States during his incarceration at St. Clair Correctional Facility in Springville, Alabama.  (Doc. 1 at 3–6).[1] The plaintiff names the following defendants in the complaint: Sergeant Jasper Liutze,[2] Sergeant Jesse Milton, Sergeant Raphael Santa-Maria, Officer Andre Lark, and Lieutenant Morris Rogers.  (*Id.* at 3).[3] The plaintiff claims that Santa-Maria used excessive force on May 2, 2018, when he unjustifiably punched him in the face causing profuse bleeding.  (Doc. 1 at 5).  The plaintiff alleges that no officers intervened to help him, and he was not taken to the medical unit despite his requests until the next morning when the plaintiff reported the incident to another guard.  (*Id.*).

---

[1]The plaintiff is currently incarcerated at Limestone Correctional Facility in Harvest, Alabama.  (Doc. 1 at 2-3).

[2] The plaintiff incorrectly identifies Sgt. Jasper Luitze as Sgt. Jasper Lawinsky in his complaint. (Doc. 19 at 1, n.1).

[3] The plaintiff originally brought his claims against seven unnamed officers but clarified in a request to correct errors that "there were five (5) defendants and there [sic] names as correctly stated again are: Sergeant Jasper Lawinsky, Sergeant Milton, Sergeant Sant Maria, Correctional Officer Lark, and Lieutenant Rogers."  (Doc. 8 at 2).

The plaintiff seeks compensatory damages for his pain and suffering, as well as declaratory and injunctive relief, including Santa-Maria's termination and a permanent record of the incident in Santa-Maria's file. (*Id.* at 4). In accordance with the usual practices of this Court and 28 U.S.C. § 636(b)(1), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

## I. Procedural History

On October 15, 2019, the magistrate judge previously assigned to this case entered an Order for Special Report directing the Clerk to forward copies of the complaint to each of the named defendants and directing the defendants to file a special report addressing the plaintiff's factual allegations. (Doc. 7). The magistrate judge advised the defendants that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, the court would consider it as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. (*Id.*).

After the previous magistrate judge granted their motion for an extension of time to file a special report, defendants Liutze, Santa-Maria, Lark, and Rogers filed a special report, supplemented by affidavits and evidence, on January 15, 2020. (Doc. 19). On January 30, 2020, the magistrate judge notified the parties that the court would construe the special report as a motion for summary judgment and notified the plaintiff that he had twenty-one days to respond to the motion for summary judgment by filing affidavits or other material. (Doc. 20). He also advised the plaintiff of the consequences of any default or failure to comply with Fed. R. Civ. P. 56. (*Id.*). *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). On February 5, 2020, the plaintiff filed a response. (Doc. 21).

2

On April 23, 2020, counsel for defendants, responding to the previous magistrate judge's order (doc. 22), provided the last known address for defendant Milton under seal.  (Doc. 25).  On May 13, 2020, he ordered the United States Marshal to serve Milton at his last known address supplied by ADOC.  (Doc. 26).  On May 29, 2020, the summons was returned as executed.  (Doc. 28).[4]  To date, Milton has not filed an answer.[5]

Defendants Liutze, Santa-Maria, Lark, and Rogers's motion for summary judgment is ripe for review.

## II. Standard of Review

Because the court has construed the defendants' special report as a motion for summary judgment, Fed. R. Civ. P. 56 governs the resolution of the motion.  Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000).  The burden of proof is upon the moving party to establish his prima facie

---

[4] The signature on the return receipt appears to read, "C Mostillo Covid 19," dated May 18, 2020.  (Doc. 28 at 2).  Service may be accomplished by "delivering a copy of the summons and of the complaint to the individual personally" or by "leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there."  FED. R. CIV. P. 4(e)(2)(A) and (B).  Furthermore, under Rule 4(l)(3), "(f)ailure to prove service does not affect the validity of service."  FED. R. CIV. P. 4(l)(3).

[5] In the Special Report and Answer filed on January 15, 2020, counsel states that "Milton is no longer employed with the Alabama Department of Corrections and therefore, has not been served."  (Doc. 19 at 1, n.2).  Counsel filed the special report in January 2020, prior to the court receiving Milton's last known address from ADOC and ordering the Marshal to serve Milton in May 2020.  (*See* n.4).

entitlement to summary judgment by showing the absence of genuine issues of material fact and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532.

However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). Additionally, because the plaintiff is *pro se*, the court must construe the complaint more liberally than it would pleadings drafted by lawyers. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). A *pro se* pleading "is held to a less stringent standard than a pleading drafted by an attorney" and is liberally construed. *Jones v. Fla. Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015).

### III. Summary Judgment Facts[6]

At the time of the incident made the basis of this case, the plaintiff was incarcerated in the St. Clair Correctional Facility in Springville, Alabama. (Doc. 1 at 3). On May 2, 2018, at approximately 10:30 p.m., the defendants entered the cell block to secure the inmates for the night. (*Id.*) Defendants Luitze and Santa-Maria stayed above on the rising or the "rock" to monitor the officers who came down into the living area to secure the inmates in their cells. (*Id.*).[7] The plaintiff asked an officer if he could go to the microwave to heat a cup of coffee, and the officer told him to "'make' it quick." (*Id.* at 4). While the plaintiff was standing at the microwave, Santa-Maria asked the plaintiff what he was wearing. (*Id.* at 4–5). The plaintiff told him he was wearing a t-shirt and shorts purchased from the ADOC commissary. (*Id.* at 5). Santa-Maria told him he should not be wearing that clothing and asked him to come up to the "rock" where he was standing. (*Id.*).[8] The plaintiff complied, and Santa-Maria "went out of the block into the hallway and asked me to follow him." (*Id.*). [9] After they were in the hallway, Santa-Maria removed his "billy stick and

---

[6] Based on the foregoing summary judgment standard, the following facts are undisputed or, if disputed, taken in a light most favorable to the plaintiff. Factual disputes are addressed in footnote form.

[7] Luitze states that on May 2, 2018, he entered the M-Dorm with Santa-Maria and other officers to conduct an institutional count and lock down. (Doc. 19-4 at 1).

[8] Luitze states that he "witnessed inmate Johnny Fox . . . wearing a large tee shirt and it appeared he was not wearing any other undergarments." (Doc. 19-4 at 1). Luitze also states that Santa-Maria told the plaintiff he could not dress that way in the common room, and the plaintiff cursed at Santa-Maria, arguing that he could wear whatever he wanted in his dorm. (*Id.*).

[9] Santa-Maria states that the plaintiff had exited his cell without permission in the middle of an institutional count and was "dressed inappropriately partially exposing his genitals." (Doc. 19-1 at 1). Santa-Maria ordered the plaintiff to return to his cell and dress appropriately in the common area. (*Id.*). The plaintiff replied with obscenities to Santa-Maria and told him he could wear whatever he wanted to wear in his block. (*Id.*). Santa-Maria states that other inmates became loud and aggressive toward the plaintiff. (*Id.*). Santa-Maria ordered the plaintiff out of the dormitory into the hallway. (*Id.*). Luitze witnessed Santa-Maria telling the plaintiff to step into the hallway, while Luitze and other officers began the count and lockdown. (Doc. 19-4 at 1).

handed it to Officer Lark, who was working in the cube." (*Id.*).[10]  As the plaintiff turned his head, Santa-Maria "blindsided [the plaintiff] with a violent blow to [his] face that knocked [him] to [his] knees" and cursed at the plaintiff. (*Id.*).[11]  The plaintiff was "bleeding profusely" and asked Santa-Maria to take him to the health care unit, but Santa-Maria refused. (*Id.*).  The plaintiff then asked Milton to take him to the medical unit, but he refused. (*Id.*).  The plaintiff states that "Rogers came into the block and as soon as he saw the blood and realized an officer had hurt an inmate, he immediately turned around and left the building." (*Id.*).[12]  The plaintiff was placed in his cell for the night. (*Id.*).[13]

---

[10] Lark was assigned to the "M cubicle" the night of May 2, 2018, which is near the L/M Hallway. (Doc. 19-5).  Lark states that Santa-Maria knocked on the cubicle door and handed Lark a broken broom stick he had confiscated on the cell block. (Doc. 19-2).  Larks states that after he took the broom stick, he "secured the cube door and continued to operate the control panel within the cube." (*Id.*).  He further states, he "did not accept a 'baton' from Sergeant Maria." (*Id.*).

[11] Santa-Maria states that when they were in the hallway, he instructed the plaintiff again about his dress. (Doc. 19-1 at 1).  Santa-Maria noticed the plaintiff had a "free-world insulated cup which was contraband and contained an unknown liquid." (*Id.*).  Santa Maria ordered him to give him the cup, but the plaintiff pulled the cup away. (*Id.* at 1–2).  Santa-Maria grabbed the cup, and the plaintiff refused to release the cup. (*Id.* at 2).  Hot coffee spilled on Santa-Maria, and he "spontaneously reacted and struck [the plaintiff] with [his] left hand (open-hand control) on the right side of his head." (*Id.*).  Santa-Maria states he did not make contact with the plaintiff's face, the plaintiff did not fall on the ground, did not bleed, and was not injured. (*Id.*).  The plaintiff bent down to pick up the cup, and Santa-Maria told him to leave the cup on the ground. (*Id.*).  Santa-Maria ordered the plaintiff to return to his cell, and the plaintiff began yelling obscenities to other inmates about his clothing. (*Id.*).

[12] Rogers states that "[o]n May 2, 2018, I . . . was not at work.  I have no knowledge of any incident concerning inmate Johnnie Foxx [sic]." (Doc. 19-3).

[13] Luitze stated that while he was on the "top tier of the dorm" he heard the plaintiff continuing to argue with Santa-Maria about his dress as Santa-Maria "escorted him to his cell to continue the lock down." (Doc. 19-4 at 1).  Luitze stated that "[a]t no point in time did inmate Fox speak with me or ask me for medical treatment." (*Id.*).

The next morning, the plaintiff reported the incident to Captain Carla Graham.  (*Id.*; doc. 19-5 at 2).  Graham completed a duty officer report and an incident report.  (Doc. 19-5 at 2–3). Graham reported the incident to Warden Estes, who instructed Graham to take the plaintiff for a medical evaluation.  (Doc. 19-5 at 2).  The incident report also reflects that Captain Gary Malone questioned Santa-Maria and Lark about the incident and told Lark to write a statement.  (Doc. 19-5 at 1).  Graham noted that "Officer Lark stated that Sgt. Santa-Maria did give Sgt. Santa-Maria's baton to Officer Lark."  (*Id.*).   Graham also noted that Warden Estes would refer the incident to the Investigations & Intelligence (I&I) Division of ADOC.  (*Id.*).

An evaluation, body chart, and pictures of the plaintiff completed in the infirmary revealed a scrape and swelling to the left side of the plaintiff's nose, bruising around his eyes, and a scrape and swelling of his right middle finger.  (Doc. 19-5 at 1, 3, 7–18).

The plaintiff also prepared a statement on May 3, 2018, describing the incident.  (Doc. 19-5 at 4–5).  He reiterated that he had on shorts and that Santa-Maria "seemed very angry that my legs were showing fairly high and ask[ed] me if I liked dressing in the block that way."  (Doc. 19-5 at 4).  Santa-Maria ordered him into the hallway and "pulled his stick out and handed it to Officer Lark in the cube."  (*Id.*).  Then he "blindsided me with a blow to the face so hard it dropped me to my knees.  My nose started pouring blood and was getting all over the floor."  (*Id.*).  The plaintiff told Santa-Maria several times that he needed to go to the medical unit, and get a body chart, and speak to a lieutenant.  (*Id.*).  Santa-Maria refused and locked the plaintiff in his cell for the night. (*Id.*).  The plaintiff stated that his nose was still "pouring blood even up to breakfast."  (*Id.*).

The investigative report prepared by I&I indicates that Agent Clark Hopper interviewed the plaintiff on December 12, 2018.  (Doc. 19-7 at 1).  The plaintiff stated that after he was called

into the hallway by Santa-Maria, Santa-Maria gave his baton to Lark in the M-cubicle.  (*Id.*).  The plaintiff stated that Santa-Maria then "'sucker' punched him in the face area, and continued to hit him four or five times."  (*Id.*).  The plaintiff stated that he requested Santa-Maria take him to the infirmary, but Santa-Maria refused and returned the plaintiff to his cell.  (*Id.*).

Agent Hopper also asked Santa-Maria about the incident, and Santa-Maria stated that the plaintiff was at the microwave in the dorm, "wearing a tee shirt and his penis and buttocks were exposed."  (*Id.* at 2).  Although Santa Maria told the plaintiff he was improperly dressed and needed to go back to his cell, the plaintiff refused to comply.  (*Id.*).  Santa-Maria told Agent Hopper that he took the plaintiff to the hallway outside the dorm.  Santa Maria explained the events related to the cup and coffee spilling on him.  (*Id.*).  Santa-Maria stated he slapped the plaintiff "across the right side of his face with an open hand," denying that he punched him or that the plaintiff asked for a body chart.  (*Id.*).

Agent Hopper obtained paperwork showing Santa-Maria's suspension for the incident, "including Sgt. Santa-Maria's written statement he wrote on Thursday, May 3, 2018." (*Id.*).[14] Agent Hopper also received copies of Warden Jones's recommendation for suspension of Santa-Maria dated May 30, 2018, signed by Santa-Maria on June 15, 2018, and Commissioner Jeff Dunn's order of suspension, dated June 19, 2018, signed by Santa-Maria on June 21, 2018.  (*Id.*).[15] The disposition of the investigation was that Santa-Maria "was charged with the following infractions, AR 208, Annex H, Number 14, AR 208, Annex H, Number 30 and AR 208, Annex H,

---

[14] Santa-Maria has not included his written statement in the Special Report.  (*See* Doc. 19).
[15] Santa-Maria has not included Warden Jones's recommendation for suspension or Commissioner Dunn's order of suspension.  (*See* Doc. 19).

Number 33, resulting in Sergeant Santa-Maria receiving three days suspension for slapping inmate Fox." (*Id.* at 2).

## IV. Analysis

### A. Official Capacity Claims

The plaintiff seeks compensatory damages against the defendants in their official capacities. (Doc. 1 at 1, 4). The plaintiff's claims for excessive force, failure to intervene, and denial of medical care against the defendants in their official capacities for money damages are due to be dismissed under the doctrine of sovereign immunity. It is well established that the Eleventh Amendment to the United States Constitution bars 42 U.S.C. § 1983 claims against the state or an agency of the state. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Likewise, Eleventh Amendment immunity also bars claims for money damages brought against officials and employees of state entities sued in their official capacities. *Id.* at 101. Thus, the defendants' motion for summary judgment on the plaintiff's claims against them in their official capacities for monetary relief is due to be granted.

### B. Individual Capacity Claims

#### 1. Excessive Force

Santa-Maria moves for summary judgment on the plaintiff's Eighth Amendment excessive force claim against him in his individual capacity. That motion is due to be denied.

The plaintiff's excessive force allegations against Santa-Maria must be analyzed under the standard set forth by the United States Supreme Court in *Hudson v. McMillian*, 503 U.S. 1 (1992) and *Whitley v. Albers*, 475 U.S. 312 (1986). *See Campbell v. Sikes*, 169 F.3d 1353, 1374–75 (11th Cir. 1999). In *Hudson v. McMillian*, the Supreme Court held that in assessing an inmate's

9

excessive force claim, "the core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7.  In extending *Whitley* to all cases involving allegations of the use of force by prison officials, the Supreme Court reasoned:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order.  Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates.  Both situations may require prison officials to act quickly and decisively.  Likewise, both implicate the principle that "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"

*Hudson*, 503 U.S. at 6 (citations omitted).

With these concerns in mind, the Supreme Court set out certain factors that should be considered when evaluating whether the force used was excessive.  These factors include: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible official; (4) any efforts to temper the severity of a forceful response; and (5) the extent of the injury suffered by the inmate.  *Whitley v. Albers*, 475 U.S. at 321.

In applying the foregoing factors to the facts of a particular case, the Supreme Court has instructed:

> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action.  The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "'repugnant to the conscience of mankind.'"

*Hudson*, 503 U.S. at 9 (citations omitted).

To create a genuine issue of material fact, the plaintiff must come forward with evidence from which a reasonable inference can be drawn that the defendant acted maliciously and sadistically. Generally, courts " do not second-guess prison officials on matters that they are better equipped to handle under the exigencies of an internal disturbance." *Wilson v. Blankenship*, 163 F.3d 1284, 1295 (11th Cir. 1998).

The plaintiff argues that he did not resist and was not threatening Santa-Maria. (Doc. 1 at 4). Santa-Maria stated that the plaintiff was dressed inappropriately and was ordered to return to his cell but the plaintiff "refused." (Doc. 19-1 at 1). The plaintiff stated that he was dressed in ADOC attire, including a t-shirt, shorts, and underwear, and that the "tee shirt was large and came down almost to the hem of my shorts." (Doc. 1 at 5; doc. 21 at 12). Thus, the plaintiff asserts that Santa-Maria's assault was unprovoked. (*Id.* at 15).

Santa-Maria states in his affidavit that in a tussle over a cup, hot coffee spilled on him and Santa-Maria "spontaneously reacted and struck inmate Fox with [his] left hand (open-hand control) on the right side of the head." (Doc. 19-1 at 2). The plaintiff states in his affidavit that the cup containing his coffee remained in the microwave when he was ordered into the hallway by Santa-Maria. (Doc. 21 at 13).

Even though Santa-Maria states that he did not hit the plaintiff in the face and the plaintiff was not injured (doc. 19-1, at 2), the evidence in the record is contrary and in direct conflict with his statements. (*See* doc. 19-5 at 1–19; doc. 19-7 at 1–2). The incident report states that Santa-Maria was charged with three infractions and suspended for three days. (Doc. 19-7 at 2). Moreover, the report states that Agent Hopper received copies of Warden Jones's recommendation for suspension and Commissioner Dunn's order of suspension. (*Id.*) However,

11

Santa-Maria did not submit either of these signed documents. (*Id.*).  Furthermore, Santa-Maria does not include the statement from May 3, 2018, which may shed light on the incident since it was completed the day after the incident.  (*Id.*).

Viewing the facts in a light most favorable to the plaintiff, and applying the standards set forth above, a reasonable jury could conclude that Santa-Maria intentionally and maliciously attacked the plaintiff by hitting him.  In addition, no force was needed to restore or maintain discipline at the time because the plaintiff had been removed from the general area into the hallway and was not posing a threat.  Furthermore, there is a genuine issue of fact as to the amount of force used.  Although Santa-Maria stated that he slapped the plaintiff on the right side of the head and he was not injured (doc. 19-1 at 2), the plaintiff stated that Santa-Maria "struck me with a violent blow to my face that knocked me straight to my knees," causing "blood pouring from my face." (Doc. 21 at 13).  The plaintiff claims that he "was still bleeding the next morning as I reported the assault."  (*Id.* at 15).  The plaintiff has created a genuine issue of material fact as to whether he suffered more than a *de minimis* injury from the encounter with Santa-Maria.

It is well established that assessing the credibility of the allegations made by the plaintiff or a defendant is beyond the scope of a trial court's ruling on a motion for summary judgment. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also, Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742-43 (11th Cir. 1996).  The facts presented by the parties show that a genuine dispute exists between the plaintiff and Santa-Maria's version of the facts in connection with the events that took place on May 2, 2018, and whether Santa-Maria used

excessive force against the plaintiff.  Therefore, Santa-Maria's motion for summary judgment on the plaintiff's Eighth Amendment excessive force claim is due to be denied.

Santa-Maria argues he is entitled to qualified immunity with respect to the plaintiff's excessive force claim.  (Doc. 19 at 21–24).  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation marks and citation omitted). To obtain qualified immunity, the government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation marks and citations omitted).  "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id*.  The plaintiff must show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (footnote omitted).

There is no dispute that Santa-Maria was acting within the scope of his discretionary authority when he allegedly used excessive force against the plaintiff on May 2, 2018.  Because there is a question of fact concerning whether Santa-Maria used excessive force against the plaintiff, he is not entitled to qualified immunity on the plaintiff's excessive force claim against him.  Specifically,

> a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force "maliciously and sadistically to cause harm" is clearly established to be a violation of the Constitution . . . .  There is simply no room for a qualified immunity defense when

13

> the plaintiff alleges such a violation.  The only question, then, is whether the plaintiff has alleged facts sufficient to survive a . . . motion for summary judgment.  If he has done so, that is the end of the inquiry.

*Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002) (citation omitted).

Accordingly, since the plaintiff has alleged facts sufficient to survive a motion for summary judgment concerning his Eighth Amendment claim against Santa-Maria for excessive force, Santa-Maria's motion for summary judgment on the basis of qualified immunity is due to be **DENIED.**

### 2.   Failure to Intervene

The plaintiff alleges the "other officers that were present at the scene failed to take reasonable steps to protect me from Sgt. Santa Maria's use of excessive force and they are liable for their non feasance (failure to intervene)."  (Doc. 1 at 6).  He further argues that "[i]t is undisputed that the [] officers were present the night [the  plaintiff] was assaulted by Sgt. Santa Maria and failed to intervene and diffuse or stop the situation or even report the situation."  (Doc. 21 at 7).

A prison guard may be liable under § 1983 if he fails or refuses to intervene when a constitutional violation occurs in his presence.  *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998).  For liability to attach, the officer must have actually been in a position to intervene. (*Id.* at 1407).  "Unless a guard has a 'realistic opportunity' to prevent an attack, he cannot be held liable under § 1983 for failure to intervene."  *Foster v. Jenkins*, No. 2:17-cv-02001-CLS-JHE, 2020 WL 1899630, at *3 (N.D. Ala. Jan. 17, 2020), *report and recommendation adopted,* 2020 WL 703390 (N.D. Ala. Feb. 12, 2020).  The standard is not met where a guard did not have a reasonable opportunity to intervene, such as when the excessive force occurs so quickly the guard could not have anticipated or stopped it.  *See Riley v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996)

14

The plaintiff states that "Luitz, Rogers, and Lark all stood there and watched me get assaulted." (Doc. 21 at 8).  However, the plaintiff specifically states in his complaint that when Santa-Maria ordered him to come up to the "rock" or rising to talk to him, the plaintiff "walked over and up the steps and [Santa-Maria] went out of the block into the hallway and asked me to follow him." (Doc. 1 at 5).  It is undisputed that Santa-Maria's alleged assault occurred "[w]hen we got in the hallway." (*Id.*).  This fact is again confirmed by the plaintiff himself when he states in his affidavit that Santa-Maria "called me out into the hallway" before he assaulted him. (Doc. 21 at 3). The plaintiff has not explained how the defendants could have known what was going to happen after the plaintiff went into the hallway.

Furthermore, Luitze states in his affidavit that after Santa-Maria ordered the plaintiff to "step out into the hallway to speak with him[,] [t]he other Officers and I started counting and locking down the unit." (Doc. 19-4 at 1).  Luitze  states that later, when he was "on the top tier of the dorm," continuing with the lock down, he heard the plaintiff again arguing with Santa-Maria about his dress as Santa-Maria "escorted him to his cell to continue the lock down." (*Id.*).  Luitz states, [a]t no point in time did inmate Fox speak with me or ask me for medical treatment." (*Id.*).

The plaintiff also states in his affidavit that after he was in the hallway, Santa-Maria "immediately removed his baton and handed it through the cube door to Officer Lark." (Doc. 21 at 13).  Lark states that after retrieving the stick, he "secured the cub[e] door and continued to operate the control panel within the cube." (Doc. 19-2).  With respect to Rogers, the plaintiff states "Lt. Rogers came into the block and as soon as he saw the blood and realized an officer had hurt an inmate, he immediately turned around and left the building." (Doc. 1 at 5; *see also* doc. 21 at

15).  Neither Lark nor Rogers were not in a position to intervene when Santa-Maria's alleged assault occurred.

In his own affidavit, the plaintiff indicates that the incident was sudden and without warning.  (Doc. 21 at 13).  In his statement the day after the incident, the plaintiff stated that after he went out the door into the hallway and Santa-Maria gave his stick to Lark in the cubicle, the plaintiff "remember[ed] thinking it was a gesture that he had no reason to keep it."  (Doc. 19-5 at 5).  Furthermore, the plaintiff stated that he was "blindsided [] with a blow to the face."  (*Id.*).  The plaintiff himself describes a sudden, unexpected and unprovoked use of force.  *See Medley v. Dunn*, No. 2:18-cv-00964-KOB-GMB, 2019 WL 4509844, at *3 (N.D. Ala. Aug. 16, 2019), *report and recommendation adopted*, 2019 WL 4464973 (N.D. Ala. Sept. 18, 2019) (noting the plaintiff made no allegations that would suggest officers could have anticipated the attack).  Based on the foregoing, there is no evidence that Luitze, Lark, or Rogers saw the attack.  Even if they had seen the alleged assault, there are no facts indicating these defendants had the opportunity to intervene.  Accordingly, the defendants' motion for summary judgment on the plaintiff's claim for failure to intervene is due to be **GRANTED**.

### 3.  Denial of Medical Care

The plaintiff alleges he was denied medical care after the incident with Santa-Maria.  (Doc. 1 at 5).  In his response, the plaintiff states the "defendants refused to allow me to get a body chart after Sgt. Santa Maria assaulted me and I explicitly requested medical attention."  (Doc. 21 at 9).

The United States Supreme Court has held that only deliberate indifference to a prisoner's serious medical needs is actionable under 42 U.S.C. § 1983.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "To prevail on a claim of deliberate indifference, a plaintiff must show: (1) a serious

16

medical need; (2) a defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016). The standard requires the plaintiff to establish facts that meet both an objective and a subjective component. *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011).  An objectively serious medical need constitutes "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Farrow v. West*, 320 F.3d 1235, 1242-43 (11th Cir. 2003) (citation omitted).  To satisfy the subjective component of a deliberate indifference claim, the plaintiff must show that the official acted with: "'(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.'"  *Id.* at 1245 (citation omitted).  Thus, a plaintiff must demonstrate that a "defendant actually knew of 'an excessive risk to inmate health or safety' and disregarded that risk." *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The plaintiff alleges that after Santa-Maria hit him, the plaintiff stated, "I told [Santa-Maria] that I was hurt and asked him several times to take me to the HUC (Health Care Unit) for medical treatment and a body chart.  He refused."  (Doc. 1 at 5).  The plaintiff reiterates in his affidavit that after the alleged assault, he told Santa-Maria to take him to the medical unit, "but he . . . refused to get me there."  (Doc. 21 at 13).  Santa-Maria denies that the plaintiff was injured and, thus, would not have had a reason to take him to the infirmary.  (*See* Doc. 19-1 at 2).  However, the evidence in the record belies Santa-Maria's assertion that the plaintiff was not injured.  As noted above, the plaintiff alleges that Santa-Maria "struck me with a violent blow to my face that knocked me straight to my knees," causing "blood pouring from my face."  (Doc. 21 at 13).  The

17

plaintiff claims that he "was still bleeding the next morning as I reported the assault." (*Id.* at 15). Moreover, an evaluation, body chart, and pictures of the plaintiff completed in the infirmary revealed a scrape and swelling to the left side of the plaintiff's nose, bruising around his eyes, and a scrape and swelling of his right middle finger. (Doc. 19-5 at 1, 3, 7–18). The injury was documented in an incident report, duty officer report, and investigative report. (*See* Doc. 19-5 at 1–2; Doc. 19-7 at 1–2). These facts are sufficient to create a genuine issue of material fact as to whether Santa-Maria had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that was more than mere negligence. Accordingly, Santa-Maria's motion for summary judgment on the plaintiff's claim of denial of medical care against him is due to be **DENIED**.

With respect to the other defendants, the plaintiff does not explain how and when he requested medical attention since he was allegedly assaulted in the hallway. (Doc. 1 at 5). In his complaint, the plaintiff states that Luitze "stayed up on the 'rock' (rising) observing and monitoring." (*Id.* at 3). In his affidavit, the plaintiff states that "Sgt. Jasper Luitze was standing there as well and did nothing to get me help for my injuries." (Doc. 21 at 15). However, at no time does the plaintiff indicate Luitze came into the hallway; the plaintiff actually states that "[a]ll three sergeants were standing on the rock and never came down into the block nor participated in any institutional count." (*Id.*). As noted, Luitze states in his affidavit that, [a]t no point in time did inmate Fox speak with me or ask me for medical treatment." (Doc. 19-4). As for Lark, the plaintiff states after he was in the hallway, Santa-Maria gave his stick to Lark, "who was working in the cube." (Doc. 1 at 5). Lark states in his affidavit that Santa-Maria knocked on the cubicle door and Lark opened his cubicle door to retrieve a stick. (Doc. 19-2). Lark then "secured the cub[e] door and continued to operate the control panel within the cube." (*Id.*). There is no evidence

in the record that either Luitze or Lark saw the plaintiff at the time of the incident or before the plaintiff was placed in his cell.  Accordingly, Luitze and Lark's motions for summary judgment are due to be **GRANTED** as to the plaintiff's claim for denial of medical care.

As to Rogers, the plaintiff does make specific statements that Rogers denied him medical care.  The plaintiff states in the complaint that "Lt. Rogers came into the block and as soon as he saw the blood and realized an officer had hurt an inmate, he immediately turned around and left the building." (Doc. 1 at 5).  In his response, the plaintiff states that "Lt. Rogers witnessed me in blood, denied me medical care." (Doc. 21 at 2).  The plaintiff reiterates in his affidavit that "Lt. Rogers had come into the dorm and seen the blood and decided to separate himself from any association or responsibility concerning the incident." (*Id.* at 15).    The plaintiff has established at least a genuine issue of material fact as to the objective and subjective components of a deliberate indifference claim against Rogers.  As to the element of causation between Rogers' indifference and the plaintiff's injury, the undersigned cannot say that the plaintiff's injuries did not worsen by spending the night in his cell before obtaining medical care the next morning.

Although Rogers states in his affidavit that "[o]n May 2, 2018, I . . . was not at work," and he has "no knowledge of any incident concerning inmate Johnnie Foxx [sic]," (doc. 19-3), the plaintiff responds that "Correctional Lieutenant Morris Rogers was at work on the time and date in which he was assaulted by Sgt. Santa Maria.  Plaintiff states that he will conduct discovery to confirm and verify this fact." (Doc. 21 at 3).  Based on the plaintiff's statement and the fact that

Rogers has not provided a work log to support his affidavit, Rogers's motion for summary judgment on the plaintiff's claim of denial of medical care against him should be denied.[16]

## V. Recommendation

For the reasons stated above, the undersigned **RECOMMENDS** the following:

1. Defendants' motion for summary judgment on the plaintiff's claims of excessive force, failure to intervene, and denial of medical care against them in their official capacities for monetary relief be **GRANTED** and the claims be **DISMISSED WITH PREJUDICE**;

2. Defendant Santa-Maria's motion for summary judgment on the plaintiff's claims of excessive force and denial of medical care against him in his individual capacity be **DENIED**;

3. Defendants Luitze, Lark, and Rogers's motion for summary judgment on the plaintiff's claims of failure to intervene against them in their individual capacities be **GRANTED** and the claims be **DISMISSED WITH PREJUDICE**;

4. Defendant Luitze's motion for summary judgment on the plaintiff's claim of denial of medical care against him in his individual capacity be **GRANTED** and the claim be **DISMISSED WITH PREJUDICE**;

---

[16] On April 17, 2020, the plaintiff filed a request for interrogatories. (Doc. 23). The Order for Special Report specifically states, "ANY REQUEST FOR LEAVE TO CONDUCT ADDITIONAL DISCOVERY MUST BE FILED WITH THE COURT WITHIN **THIRTY (30) DAYS** FROM THE DATE OF THE CERTIFICATE OF SERVICE ON THE SPECIAL REPORT." (Doc. 7 at 6–7). The date on the certificate of service on the special report was January 15, 2020. (Doc. 19 at 25). Accordingly, because the plaintiff did not file a request for leave to conduct additional discovery by February 15, 2020, his request for interrogatories is untimely.

5.  Defendant Rogers' motion for summary judgment on the plaintiff's claim of denial of medical care against him in his individual capacity be **DENIED.**

6.  The plaintiff's claims for failure to intervene and denial of medical care against Defendant Milton in his individual capacity be **DISMISSED WITHOUT PREJUDICE.**[17]

Thus, the undersigned recommends all claims be dismissed except Plaintiff's excessive force and denial of medical care claims against Santa-Maria and Plaintiff's denial of medical care claim against Rogers.  These claims should go forward.

### VI. Notice of Right to Object

Any party may file specific written objections to this report and recommendation.  A party must file any objections with the Clerk of Court within fourteen (14) calendar days from the date the report and recommendation is entered.  Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objecting. Objections also should specifically identify all claims contained in the complaint that the report and recommendation fails to address.  Objections should not contain new allegations, present additional evidence, or repeat legal arguments.  An objecting party must serve a copy of its objections on each other party to this action.

---

[17] Milton has not moved for summary judgment or filed an answer in this case.  (*See* Doc. 28).  Because the plaintiff has not moved for a default judgment against Milton (*see* Federal Rule of Civil Procedure 55(b)(2)), the undersigned recommends dismissal of the plaintiff's claims against Milton without prejudice.

21

Failing to object to factual and legal conclusions contained in the magistrate judge's findings or recommendations waives the right to challenge on appeal those same conclusions adopted in the district court's order.  In the absence of a proper objection, however, the court may review on appeal for plain error the unobjected to factual and legal conclusions if necessary in the interests of justice.  11th Cir. R. 3-1.

On receipt of objections, a United States District Judge will review *de novo* those portions of the report and recommendation to which specific objection is made and may accept, reject, or modify in whole or in part, the undersigned's findings of fact and recommendations.  The district judge must conduct a hearing if required by law.  Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence.  Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record.  The district judge also may refer this action back to the undersigned with instructions for further proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may only appeal from a final judgment entered by a district judge.

DONE this 22nd day of July, 2020.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE